IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TERESA ANN TAYLOR  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | CIVIL ACTION NO. |
| ) | 2:08-CV-1386-KOB |
| MICHAEL J. ASTRUE,  ) | |
| Commissioner,  ) | |
| Social Security Administration,  ) | |
| ) | |
| Defendant. | |

**MEMORANDUM OPINION**

**I. Introduction**

The claimant, Teresa Ann Taylor, brings this action seeking judicial review of a final decision of the Commissioner of Social Security who denied her claim for Supplemental Security Income ("SSI").  On September 21, 2005, the claimant protectively filed an application for SSI under Title XVI of the Social Security Act.  (R. 408).  The claimant alleges that she has been disabled since September 1, 2004 because of asthma, depression, diabetes, hypertension, migraine headaches, affective mood disorder, back, ankle and leg problems, chronic obstructive pulmonary disease, and reflex sympathetic dystrophy syndrome.  (R. 408).  The Social Security Administration ("SSA") denied the claimant's application initially, and the claimant made a timely request for a hearing before the Administrative Law Judge ("ALJ") on January 23, 2006. (R. 57).  The ALJ conducted the hearing on August 1, 2007, and issued an unfavorable decision on October 2, 2007, denying benefits.  (R. 408).  The claimant appealed to the SSA Appeals Council from the ALJ's denial of benefits on March 12, 2008.  (R. 5).  On May 30, 2008, the

Appeals Council denied the claimant's request for review. (R. 4). This denial rendered the ALJ's opinion the final decision of the Commissioner. Thus, this case is now ripe for review pursuant to 42 U.S.C. § 1383(c)(3). For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II. Issue Presented

In this appeal, the claimant argues that the Commissioner erred in four ways. First, the claimant alleges that the ALJ failed to consider the chronic regional pain syndrome ("CRPS") diagnosis, also known as reflex sympathetic dystrophy syndrome ("RSDS"), within the framework of Social Security's own ruling SSR 03-2p. Second, the claimant alleges that the ALJ substituted his own "hunch or intuition" for that of the physicians. Third, the claimant submits that the ALJ committed reversible error when he ignored the opinion of Dr. John Neville, Social Security's consultative examiner. Finally, the claimant alleges that the ALJ failed to consider her impairments in combination and the effect that these impairments would have on her ability to work.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The court does not review the Commissioner's factual determinations *de novo*, but

the court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence upon which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when he or she cannot engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period if not less than twelve months. To make this determination, the

> Commissioner employs a five-step, sequential evaluation process:
>
> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal on of the specific impairments as set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

## V. Facts

The claimant was born in 1965 and has a seventh grade education. (R. 410). She participated in special education programs from the third grade to the seventh grade, smokes a pack of cigarettes daily, and has a history of crack cocaine addiction. (R. 28, 119, 436). Her past relevant work experience includes employment as a dirt packer paving roads with A-pack, a construction worker, and a cashier at a grocery store. (R. 415, 438). The claimant has not engaged in substantial gainful activity since September 21, 2005, when, according to the claimant, she began having "a lot of difficulty dealing with depression." (R. 21, 416). The claimant applied for SSI on September 21, 2005, alleging that she became unable to work on September 1, 2004 because of asthma; depression; type two diabetes; hypertension; migraine headaches; affective mood disorder; back, ankle, and leg problems; chronic obstructive pulmonary disease; and RSDS. (R. 46, 80).

William T. Edge, M.D., a general surgeon, began treating the claimant for lumbar pain on January 14, 2002. (R. 130). On the date of this visit, Dr. Edge described the claimant as "nervous and anxious" with a paraspinous muscle spasm, a small compression fracture, and a vacuum disc in the mid thoracic spine. (R. 135). The claimant returned to Dr. Edge on April 23, 2003 complaining of an upper respiratory problem and mucopurulent sputum. (R. 131). The claimant returned again on June 13, 2005 for a scheduled epidural block. *Id.*

On September 13, 2004, the claimant had surgery to correct a left calcaneal (heal) fracture she sustained in July 2004. (R. 24, 117-18). The claimant returned to the Division of

4

Orthopaedic Surgery on September 21, 2004, where Jorge E. Alonso, M.D. instructed the claimant to remain non-weightbearing. (R. 148). On November 2, 2004, Dr. Alonso referred the claimant "to see Dr. Volgas for evaluation for soft tissue coverage." (R. 146).

On January 14, 2005, the claimant visited the Kirklin Pain Treatment Center complaining of "chronic left foot pain status post ORIF of the left calcaneus," where she saw Leslye Howell Jones, M.D. (R. 102, 119). In reviewing of the claimant's systems, Dr. Jones described the claimant as "alternately sleepy and tearful." (R. 118-119). During this visit, the claimant told Dr. Jones that she was sleeping no more than three hours per night as a result of her pain. *Id*. Dr. Jones diagnosed the claimant with RSDS[1] to the lower left extremity, and depression. (R. 103). Dr. Jones prescribed Elavil for the claimant's depression and neuropathic pain and gave her a pain score of "9/10 or 10/10." (R. 107).

On February 4, 2005, the claimant visited the Kirklin Pain Treatment Center again, this time complaining of chronic left foot pain described as a constant, unrelenting, burning pain aggravated by contact. (R. 100). Dr. Jones recorded the claimant's pain score as 10/10, reported that the claimant had "1+ edema over her left lower extremity and foot," diagnosed the claimant with CRPS type one and depression, and subsequently performed a lumbar sympathetic plexus block. (R. 100-01). Nabil M.K. Ali, M.D. performed a second lumbar sympathetic plexus block on February 18, 2005. (R. 97). On April 8, 2005, the claimant returned to the Kirklin Pain

---

[1]Social Security Ruling 03-2p defines RSDS as "chronic pain syndrome often resulting from trauma to a single extremity." SSR 03-2p, *Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome*, <http://www.ssa.gov/OP_Home/rulings/di/01/SSR2003-02-di-01.html> (visited August 5, 2009). RSDS can result from diseases, surgery, or injury affecting parts of the body. *Id*. The most common complaints include severe pain at the site of the precipitating trauma. *Id*.

5

Treatment Center requesting an "additional block for her left lower extremity chronic regional pain syndrome type one." (R. 94). Dr. Ali reiterated his diagnosis of CPRS type one and depression, and performed a lumbar sympathetic plexus block. *Id*.

On April 29, 2005, the claimant returned to the Kirklin Pain Treatment Center for a follow up visit and medical check. (R. 93, 126). On that date, her chief complaints were CRPS type one and depression. *Id*. Dr. Jones prescribed Percocet, Lortab, and Klonopin. *Id*. The claimant returned to the Kirklin Pain Treatment Center for her fourth lumbar sympathetic block on June 17, 2005. (R. 112, 124). Dr. Jones saw the claimant again on July 1, 2005. (R. 111, 123). At the conclusion of the July 1 visit, Dr. Jones prescribed Lortab, Klonopin, and physical therapy with an excuse to allow the claimant to "remain off work during this two week period until she is able to undergo a block." *Id*. On July 15, 2005, the claimant returned to the Kirklin Pain Treatment Center on which date her physical examination revealed that her left foot was erythematous (abnormally red) and that she had mild allodynia (a painful response to a non-painful stimulus), decreased range of motion, and a pain score of 10/10. (R. 110, 122).

Clark Gray, M.D. treated the claimant from the period of April 13, 2004 through April 16, 2007. (R. 232). On August 16, 2005, Dr. Gray diagnosed the claimant with depression, headaches, asthma, and chronic back pain. (R. 253). On August 18, 2005, Dr. Marc Kundler, a psychiatrist, stated that the claimant suffered from major depression and headaches of unknown etiology. (R. 160). Dr. Kundler reported that the claimant's symptoms were mostly melancholic and gave the claimant a trial of Zoloft, a trial of Lunesta, and an individual therapy referral. *Id*. Dr. Kundler noted that the claimant "came from a dysfunctional family" and has had a difficult time coping with several deaths in the family. (R. 158). Dr. Kundler placed the claimant at 65

on the Global Assessment of Functioning ("GAF") scale, indicating moderate difficulty in social or occupational functioning.  (R. 160).

On September 9, 2005, the claimant again visited the Kirklin Pain Treatment Center alleging "left foot pain secondary to [CRPS type one,] and depression."  (R. 109, 121).  At that time, Dr. Jones planned to consider a fifth lumbar sympathetic block after the claimant's pulmonary status was cleared.  *Id*.  On September12, 2005, Dr. Clark again diagnosed the claimant with depression, migraines, asthma, and chronic back pain.  (R. 253-54).  On September 20, 2005, the claimant had an MRI that showed lumbar radiculopathy and spinal stenosis.  (R. 136).  John F. Crewes, M.D. performed a head thin cut exam on the claimant on August 19, 2006.  (R. 270).  The results of this examination revealed that the claimant's "motion limits several slices . . . [and] [t]he brain appears to have normal attenuation, structure and volume."  *Id*.

On October 4, 2006, Dr. Gray ordered Angus Baird, M.D. to perform a dynamic axial helical CT of the chest, which revealed a "wedge shaped region of irregular confluent opacity present in the medial aspect of the lower lobe of the left lung inferior abutting the cotophrenic pleura approximately 3 x 2 cm in size."  (R. 266).  The claimant visited Dr. Gray again on October 13, 2005, at which time Dr. Gray diagnosed the claimant with "COPD, [m]igraine, [d]epression, [c]hronic back pain, [and] [a]bdominal pain."  (R. 249).  On that date, the claimant complained of intermittent abdominal pain, and reported that she suffered from between two and three "bad headaches per week."  *Id*.  On October 24, 2006, Dr. Gray listed the claimant's problems as "[a]sthma, with continued tobacco abuse, possible early chronic obstructive pulmonary disease; [m]igraine headaches, chronic; [p]eptic ulcer disease in October of 2005;

[d]epression; [c]hronic left foot pain, status post crush injury; [p]ersonality disorder, not otherwise specified; [h]istory of pulmonary nodules, most likely inflammatory; [t]ype 2 diabetes, recently diagnosed; hypertension; [t]obacco abuse; [p]ossible obstructive sleep apnea; [and] [d]izziness with negative MRI dopplers." (R. 234). On November 3, 2005, Dr. Gray diagnosed the claimant with "[c]hronic obstructive pulmonary disease, [m]igraine, [p]eptic ulcer disease, [d]epression, [and] [c]hronic back pain." (R. 247).

On October 18, 2005, the claimant underwent an esophagagastroduodenoscopy with biopsy that indicated a questionable short segmental Barrett's esophagus and a gastric ulcer. (R. 150). The biopsy of the stomach revealed necrotic debris with acute inflammation, and gastric mucosa with moderate acute and chronic inflammation. (R. 152). At that time, Joseph B. Luttrell, M.D. recommended that the claimant "diet as tolerated, continue Nexium for at least eight weeks, stop Goody powders and other anti-inflammatory medications, stop smoking, [and] repeat endoscopy in eight weeks to ensure healing." (R. 150).

On October 25, 2005, the claimant completed a Daily Activities Questionnaire in which she alleged that her nerve blocks, lung problems, back injuries, "crushed foot," and medications prevented her from working. (R. 85). She additionally opined that pain and nerve issues prevented her from sleeping, as a result of which she took Lunesta once a day and Clonazepam three times a day to facilitate sleeping. (R. 81). Additional problems the claimant reported include inability to stand on her foot long enough to cook, concentrate while reading, go out dancing with her friends, perform a chore requiring more than ten minutes to complete, and walk for more than ten minutes. (R. 83-4).

On December 1, 2005, Dr. John Neville, Ph.D. performed a consultative evaluation

requested by the Disability Determination Service (DDS). (R.162-64). Dr. Neville stated in his record of the December 1 visit that the claimant was "alert and well oriented" with "adequate" judgment and insight. (R. 162-64). Dr. Neville further opined that the claimant was "able to understand instructions," and that her ability to respond appropriately to co-workers was only mildly to moderately impaired. (R. 163-64). Dr. Neville also noted that the claimant was "not confused" and did not have any hallucinations, delusions, obsessions, panic attacks, phobias, slurring, loose associations, or suicidal or homicidal ideations. (R. 163). Dr. Neville diagnosed the claimant with Axis I Major Depressive Disorder and Axis II Borderline Intellectual Functioning. (R. 164). According to Dr. Neville, the claimant's mood disorder "moderately to severely" impaired her ability to carry out instructions and cope with ordinary work pressures. (R.164). Dr. Neville concluded that the claimant had the ability to function independently and understand instructions, but her psychological problem and inability to cope with ordinary work pressures "would generally preclude work." (R. 164, 448).

On December 3, 2005, the DDS sent the claimant to Dr. Wade Naven for a consultative evaluation. (R.191-95). Dr. Naven noted that the claimant's left lower extremity pain had been greatly increased as a result of her inability to get pain blocks. (R. 194-95). Dr. Naven diagnosed the claimant with COPD and "neuropathic pain of the left lower extremity." *Id*.

In December 2005, the claimant began receiving treatment from Dr. Jason McKeown at the Kirklin Pain Treatment Center. (R. 25). Dr. McKeown noted that the claimant's physical examination did not support a finding of CRPS. *Id*. He also found that the that the claimant exaggerated her pain behaviors. *Id*. In January, 2006, Dr. McKeown reiterated that the claimant "did not meet the clinical criteria for a diagnosis of [CRPS]" and also reported that the claimant

9

was not as limited as she alleged, based on the claimant's report that the swelling in her left foot occurred "after she was up on her feet doing housework all day." *Id*.

Gloria Roque, Ph.D. gave the claimant a Mental Residual Functional Capacity Assessment on December 5, 2005. (R. 173, 180). Dr. Roque concluded that the claimant's "ability to understand and remember detailed instructions;" "ability to carry out detailed instructions;" "ability to maintain attention and concentration for extended periods;" "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and "ability to work in coordination with or proximity to others without being distracted by them" was moderately limited. (R. 173).

During the Physical Residual Functional Capacity Assessment on December 14, 2005, Medical Consultant Natalie D. Warren diagnosed the claimant with "Degenerative Joint Disease-Left Ankle" and asthma. (R. 196). Warren reported that the claimant could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight hour workday, and push and/or pull for an unlimited duration. (R. 197). Warren further reported that the claimant could never climb ladders, ropes or scaffolds. (R. 198).

On October 24, 2006, Dr. Gray found that the claimant suffered from "[a]sthma, with continued tobacco abuse, possible early chronic obstructive pulmonary disease; [m]igraine headaches, chronic; [p]eptic ulcer disease in October of 2005; [c]hronic left foot pain, status post crush injury; [p]ersonality disorder, not otherwise specified; [h]istory of pulmonary nodules, most likely inflammatory; [type two] diabetes, recently diagnosed, hypertension; [t]obacco abuse; possible obstructive sleep apnea; [d]izziness with negative MRI, dopplers." (R. 234-35).

On January 5, 2007, and again on January 17, 2007, the claimant was admitted to

Princeton Baptist Medical Center. (R. 209-12). Dr. James H. Lott III reported that the January 5, 2007 examination revealed that the claimant had mucus plugs; COPD with bronchospasm; "status asthma and bronchitis; tobacco abuse with COPD, anxiety disorder; type [two] diabetes mellitus; out of control; possible vocal cord dysfunction syndrome; [and] hypertension." (R. 209, 222). On that date, the claimant reported feeling depressed and anxious all the time. (R. 224). Dr. Lott reported that the claimant's shortness of breath was caused by asthma and COPD, which caused moderately severe chest pain exacerbated by exertion and coughing. (R. 216). He additionally concluded that the claimant "probably has vocal cord dysfunction syndrome" and has been coughing up sputum. (R. 222).

Praveen Jetty, M.D. examined the claimant on January 8, 2007 during the claimant's hospitalization. (R. 223-26). Dr. Jetty opined that the claimant's "[s]peech was coherent and goal directed," her "mood [was] anxious and depressed," and her "personal judgement [was] impaired." (R. 225). Dr. Jetty diagnosed the claimant with Major Depression Disorder and "[n]on-insulin-dependent diabetes mellitus." *Id*. On the GAF, Dr. Jetty placed the claimant "between 50 to 60," "which is indicative of only mild symptoms or some difficulty in social or occupational functioning, but with good overall functioning." (R. 30, 225).

In between the two hospitalizations, on January 12, 2007, Ricardo Bracer, M.D. examined the claimant because of nerve root compression. (R. 208). Dr. Bracer found that the claimant's spine looked normal. *Id*. On January 17, she was readmitted to Princeton Baptist Medical Center with a chest infection, and also complained of odynophagia and dysphagia. (R. 211). On that date she had an esophagogastroduodnoscopy that revealed a hiatal hernia and multiple ulcers in the esophagus indicative of viral infection. *Id*.

On January 3, 2006, the claimant filed a request for an ALJ hearing. (R. 63). In her request, the claimant reported that she was taking Vicodin, Aldomet, Reglan, Colace, Natal GT, and Fec Plus. (R. 60). Her report also alleged that she required assistance with household chores and personal hygiene. (R. 61).

The hearing took place on August 1, 2007. (R. 87). At the hearing, the claimant testified that her left ankle hurt constantly because of nerve damage, preventing her from engaging in activities of which she was previously capable, including walking and standing for prolonged periods. (R. 411). The claimant reported that Dr. Jones had performed surgery on her ankle three years prior to the date of the hearing. (R. 413). For almost one year after the surgery, the claimant was confined to a wheelchair; at the date of the hearing the claimant had been using a cane to walk. (R. 426). At the time of the hearing, this problem with her ankle continued to prevent her from standing to wash dishes, standing up straight, and putting too much pressure on her foot. (R. 425). The claimant stated that propping her foot up on a pillow "as much as possible" allowed her to feel more comfortable, but no doctor has stated that the claimant must elevate her foot. (R. 428).

The claimant further testified that she took Lortab 10 and hydrocodone every four hours daily. (R. 412). When asked about significant pain, the claimant reported that her legs "can't keep still at night" and are "constantly kicking," for which she takes Ambien to facilitate sleeping. (R. 418). The claimant reported that six years prior to the hearing she "had a lot of difficulty dealing with depression," and at the date of the hearing, she couldn't "get out and go to Wal-Mart like normal people do" because of her pain and depression. (R. 413). At the time of the hearing, she had been taking Zoloft, Klonopin, and Trazodone prescribed by Dr. Lott for her

depression. (R. 429-30). When asked about her history of an injured back, the claimant alleged that her "ex-husband broke her back," an injury that resulted in continued constant back pain. (R. 417). Additional impairments the claimant reported at the hearing include asthma, lung infections, predilection for pneumonia, type two diabetes, depression, ankle pain, migraine headaches, vertigo, high blood pressure, and gastroenteritis. (R. 424).

      James A. Hare, a vocational expert, testified at the hearing. (R. 434). Mr. Hare classified the claimant as "a younger lady, being under 50," with a limited education. (R. 435). Mr. Hare rated the claimant's work as a cashier at a grocery store as "light and unskilled," and her work as a dirt packer as "heavy and unskilled." (R. 438-40). The vocational expert gave "ticket marker," "cafeteria cashier," "surveillance system monitor," and "information clerk" as examples of "sit or stand light and sedentary jobs at the unskilled level" that would "fit within the background of" the claimant. (R. 444-46). The vocational expert next determined that the pain the claimant described would impact her "concentration, pace and persistence, her ability to withstand work pressures, her ability to focus, maintain production on task" such that the claimant would not be able to "do any of [her] past work for any of the jobs at the sit-stand, light and sedentary levels." (R. 446). The vocational expert concluded that the claimant "would be able to perform the requirements of over 2,500,000 representative occupations in the United States and over 38,000 representative occupations in the state of Alabama. (R. 32, 444-45). The vocational expert also testified that *if* the claimant's file were consistent with "what Dr. Neville[, a one time examining physician,] has put down as his evaluation from a functional standpoint relating to her psychological problem," the claimant would be precluded from all work because of her inability "to cope with ordinary work pressures" and her inability "to carry out instructions." (R. 448).

Based on the vocational expert's testimony, the ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 32). The ALJ also determined that the claimant was "unable to perform any past relevant work" and possessed "no skills which would transfer to other semi-skilled or skilled occupations within her residual functional capacity." (R. 31). He further opined that "the claimant is capable of performing work at the light level of exertion, especially if she is allowed to sit or stand as needed throughout the day," and ultimately concluded that the claimant was not disabled. (R. 27).

In addition, the ALJ reported in his decision that "the claimant's allegations simply are not credible given her normal physical examination, drug seeking behavior and misinformation provided by her to her physicians." (R. 27). In applying the pain standard, the ALJ stated that the claimant's "conditions are not of the severity that they could reasonably be expected to give rise to her alleged symptoms." (R. 24). The ALJ, upon "careful consideration of the entire record," found that "the claimant has the residual functional capacity to perform light work with a sit/stand option," and that "her pain and depression impose no greater than mild to moderate functional restrictions on her ability to engage in basic work activities." (R. 22).

On March 12, 2008, the claimant appealed to the SSA Appeals Council from the ALJ's denial of benefits. (R. 5). On May 30, 2008, the Appeals Council denied the claimant's request for review. (R. 4). This denial rendered the ALJ's opinion the Commissioner's final decision.

## VI. Discussion

### A. The ALJ Did Not Fail to Consider the CRPS/ RSDS Diagnoses

The claimant contends that the ALJ erred by failing to properly evaluate her CRPS/ RSDS diagnosis. Specifically, the claimant contends that the ALJ is "unaware that Social Security has recognized reflex sympathetic syndrome/ complex regional pain syndrome." (Pl.'s Br. at 8). The Eleventh Circuit has held that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," provided that the ALJ's decision is sufficient to enable the court to conclude that he properly evaluated the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

However, in the instant case the ALJ clearly did consider the claimant's diagnoses of RSDS/ CRPS. Dr. Jones first diagnosed the claimant with CRPS/ RSDS to the left lower extremity on January 14, 2005. (R. 118-119). Contrary to the claimant's contention that the ALJ was "unaware" of SSR 03-2p, the ALJ did discuss the claimant's diagnosis of RSDS throughout his decision and ultimately concluded, after careful consideration of the entire record, that the claimant had "questionable" CRPS. (R. 21). He proceeded to note that the claimant's impairments, including the questionable CRPS, caused significant vocationally relevant limitations. *Id*. Moreover, the ALJ acknowledged that while some of the medical evidence reveals that the claimant has been diagnosed with questionable CRPS and possible RSDS, Dr. McKeown's physical examination of the claimant in December 2005 did not support a finding of CRPS. (R. 24-25). The ALJ's discussion of the claimant's diagnosis of RSDS fulfilled his duty of considering relevant evidence. Therefore, the claimant's allegation that the ALJ "did not properly consider or perhaps did not consider this diagnosis at all" is completely unfounded.

(Pl.'s Br. at 8).

### B. The ALJ Did Not Substitute His Own Judgment for that of a Physician.

The claimant also alleges that the ALJ substituted his own hunch or intuition for the diagnoses of eight different pain specialists at Kirklin Clinic by finding that she had "questionable RSDS." (Pl.'s Br. at 9). Specifically, the claimant contends that the ALJ "put his own medical opinion into his decision and that no physician has stated that her CRPS was questionable." (Pl.'s Br. at 8). The Eleventh Circuit has continuously held that as a hearing officer, an ALJ cannot substitute his own judgment for that of a physician. *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992); *Graham v. Bowen*, 786 F.2d 1113,1115 (11th Cir. 1986); *Freeman v. Schwiker*, 681 F.2d 727, 731 (11th Cir. 1982).

This contention is equally without merit because the ALJ in the instant case did not substitute his own opinion for that of the physicians. First, Dr. Alonso referred the claimant to Dr. Jones "for evaluation for *possible* RSDS of the left foot." (R. 119) (emphasis added). Second, although Dr. Jones diagnosed the claimant with RSDS on January 14, 2005, Dr. McKeown noted that the physical examination of the claimant in December 2005 did not support a finding of CRPS or RSDS. (R. 24-25, 120). Therefore, the ALJ's finding that the claimant's impairments included "questionable RSDS" is based directly on the objective medical evidence.

### C. The ALJ Did Not Ignore the Opinion of the Consultative Examiner

The claimant additionally submits that the ALJ committed a reversible error by ignoring the opinion of Dr. John Neville, Social Security's own impartial psychological consultative examiner. (Pl.'s Br. at 9). While the ALJ must consider all medical opinions when making a disability determination, he "may reject any medical opinion if the evidence supports a contrary

16

finding." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).  Moreover, when choosing to give little weight to medical opinion, the ALJ must articulate his reasons for doing so.  *Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987).

Rather than ignoring Dr. Neville's opinion, the ALJ discussed Dr. Neville's opinion at length on page eleven of his decision and clearly articulated his reasons for disregarding the opinion.  (R. 29).  The ALJ was justified in his decision to place little weight on Dr. Neville's opinion regarding the claimant's functional limitations.  (R. 29).  First, as the ALJ notes, Dr. Neville's opinion is inconsistent with "his own narrative report."  (R. 29).  For example, despite Dr. Neville's observations–including that claimant was "able to understand instructions," that her ability to respond appropriately to co-workers was only mildly to moderately impaired, and that she was "cognitively able to manage financial benefits" and "psychologically capable of functioning independently,"–he diagnosed the claimant with Major Depressive Disorder and Borderline Intellectual Functioning.  (R. 164).  Furthermore, Dr. Neville reported that the claimant was able to provide information regarding her prior medical and personal history; function independently; compute mathematical equations; and discuss current events, social knowledge, and general information–all of which are inconsistent with his diagnostic impression of Major Depressive Disorder and Borderline Intellectual Functioning.  (R. 164).  Moreover, although his overall impression of the claimant reflected that she was "normal other than a depressed mood and tearfulness," Dr. Neville listed that her "ability to cope with ordinary work pressures was considered severely impaired."  *Id*.  The court agrees with the ALJ that inconsistencies exist within Dr. Neville's own findings, justifying the ALJ's decision to disregard Dr. Neville's opinion.

Second, as the ALJ notes, Dr. Neville's report is inconsistent with the record as a whole. (R. 29). Specifically, Dr. Neville's report is inconsistent with Dr. Kundler's diagnosis, Dr. Jetty's diagnosis, and the claimant's own testimony. (R. 29). Dr. Kundler gave the claimant a score of 65 on the GAF scale, and Dr. Jetty gave the claimant a GAF score of "between 50 and 60" both indicating that the claimant had good overall functioning. (R. 30, 160, 225). Neither Dr. Kundler nor Dr. Jetty stated that the claimant was disabled, and neither physician placed any limitations on her ability to work. *Id*. Based on Dr. Jetty's and Dr. Kundler's records, the claimant's pain and depression are "reasonably expected to impose no greater than mild to moderate functional restrictions on her ability to engage in basic work activities described in 20 C.F.R. § 416.921. (R. 30-31). Dr. Jetty's and Dr. Kundler's assessments stand in contradistinction to Dr. Neville's opinion that the claimant's ability to cope with ordinary work pressures was severely impaired. (R. 164).

Finally, the claimant's own testimony that she was hospitalized in January 2007 because of depression is contradicted by her treatment records from Princeton Baptist Medical Center, which indicate that she was hospitalized as a result of chronic obstructive pulmonary disease. (R. 30, 204-31, 422). Her testimony on the severity of her depressive symptoms is also contradicted by Dr. Jetty's and Dr. Kundler's rating of the claimant as a 65 on the GAF. Because a medical source's opinion may be properly discounted when the opinion is not well-supported and is inconsistent with the record as a whole, the ALJ was justified in his decision to give little weight to Dr. Neville's opinion and ultimately find that the claimant was not disabled.

**D.   The ALJ Considered the Combined Effects of the Claimant's Impairments**

Finally, the claimant submits that the ALJ failed to consider her exertional and

18

nonexertional impairments (borderline intelligence, depression, chronic pain) in combination and the effect such impairments would have on her ability to work. (Pl.'s Br. at 9). An ALJ must consider all of the claimant's subjective complaints and give adequate consideration to the effect that the combination of exertional and non-exertional impairments has on the claimant's ability to work. *Caulder v. Bowen*, 791 F.2d 872, 880 (11th Cir. 1986). Where a claimant has alleged several impairments, the Commissioner has a duty to consider the impairments in combination and determine whether the combined impairments render the claimant disabled. *Jones v. Dept. of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991).

In the instant case, the ALJ discussed each of the claimant's impairments individually before determining that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR §§ 416.920(d), 416.925 and 416.926." (R. 21). On page four of his opinion, the ALJ considered the claimant's mental impairments, "singly and in combination;" activities of daily living; residual functional capacity, giving consideration to subjective allegations; subjective complaints; age; education; work experience; and the medical record as a whole, including the opinions of multiple treating and examining physicians. (R. 21-32). Further, during the hearing, the ALJ said, "put all of them together, I can look at each individually, and as a whole, all of them together, and decide her case." (R. 449-50). Therefore, the ALJ did review the claimant's impairments in combination. The court's review of the record reveals that the ALJ had substantial evidence on which to base his decision that the claimant has the residual functional capacity to perform several "jobs that exist in

significant numbers in the national economy" and is, therefore, not disabled.

### VII. Conclusion

For the reasons stated, the court AFFIRMS the Commissioner's decision. The court will enter a separate Order consistent with this opinion.

Dated this 15th day of August, 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE